UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CELTIC INTERNATIONAL, LLC,<br><br>           Plaintiff,<br><br>      v.<br><br>BNSF RAILWAY COMPANY,<br><br>           Defendant. | No.  2:14-cv-02158-TLN-DB<br><br><br>**ORDER** |

This is a lawsuit for damages following a train derailment.  The matter is before the Court on Defendant BNSF Railway Company's ("BNSF") Motion for Summary Judgment.  (ECF No. 23.)  Plaintiff Celtic International, LLC ("Celtic") opposes the motion.  (ECF No. 33.)  Also before the Court are Plaintiff Celtic International, LLC's ("Celtic") Motion to Strike (ECF No. 39), Celtic's Motion to Amend (ECF No. 22), and Celtic's Motion to Set a Pretrial Conference (ECF No. 59).  For the reasons discussed below, BNSF's Motion for Summary Judgment is GRANTED, Celtic's Motion to Strike is DENIED, Celtic's Motion to Amend is DENIED, and Celtic's Motion to Set a Pretrial Conference is DENIED as moot.

I.     **FACTUAL AND PROCEDURAL BACKGROUND**

Celtic seeks damages for three shipments of wine that were destroyed when the train carrying the shipments derailed.  Celtic is a broker that was involved in arranging the wine's ill-fated, transcontinental journey.

Three wholesalers purchased wine from suppliers in California. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts, ECF No. 33-1 at No. 1.) Those wholesalers also sent copies of their purchase orders to Cobalt Transport Service, Inc. ("Cobalt"), which in turn arranged for the wine to be consolidated as necessary and loaded into three intermodal shipping containers. (ECF No. 33-1 at Nos. 1–2.) At that point, a sales agent for Celtic named DSB, Inc. ("DSB") became involved with the arrangements. It is not immediately clear how the shipments changed hands between Cobalt and DSB, although they appear to be closely related and roughly interchangeable in this context. (*See, e.g.*, McMurray Decl. Ex. E ("Hertwig Dep."), ECF No. 23-10 at 29:24–25 ("And once [the order is] ready Cobalt and/or DSB make the arrangements.").) In any case, the precise arrangement is immaterial.

Acting through DSB, Celtic contracted with J.B. Hunt Transport, Inc. ("J.B. Hunt") to have the shipments transported from Napa, California to Little Rock, Arkansas and Memphis, Tennessee, where the wholesalers had requested delivery. (McMurray Decl. Ex. F ("Hyland Dep."), ECF No. 23-10 at 25:9–14.) Celtic expected that J.B. Hunt would in turn "secure arrangements with a rail carrier for the rail transport of the three containers." (Hyland Dep., ECF No. 23-10 at 24:4–7.) Celtic disputes this characterization. (*See* ECF No. 33 at 2:5–8.)

J.B. Hunt secured arrangements for rail transportation with BNSF. Since 2009, J.B. Hunt has been able to ship with BNSF under a custom rate authority known as JBPREMIUM. (Kessler Decl., ECF No. 23-3 at ¶ 5.)[1] JBPREMIUM incorporates by reference a document known as the BNSF Intermodal Rules and Policy Guide (the "IR & PG"). (ECF No. 23-3 at ¶ 5.) The IR & PG

---

[1] Celtic objects to the entire declaration of Richard D. Kessler ("Kessler") on the grounds that BNSF refused to make Kessler available for deposition. (Pl's Objs. to Evid., ECF No. 33-2 at 1.) Celtic cites Rule 37(d) and 56(d) of the Federal Rules of Civil Procedure in support of its objection. (ECF No. 33-2 at 1.) Neither rule supports Celtic's objection. Rule 37(d) permits the Court, on motion, to impose sanctions for certain discovery violations. Fed. R. Civ. P. 37(d). Celtic has not made a motion for sanctions, so the Court finds that Rule 37(d) is inapposite. Rule 56(d) is also unavailing. Even assuming Rule 56(d) is a proper basis for an evidentiary objection, its standard is not satisfied here. Rule 56(d) allows a non-moving party to oppose summary judgment and seek a continuance of discovery by showing through "affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." A party invoking Rule 56(d) "must identify the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." *Tatum v. City and Cty. of S.F.*, 441 F.3d 1090, 1100 (9th Cir. 2006). Although Celtic's counsel has submitted a declaration identifying several issues about which Celtic would like further discovery, she has not explained what facts further discovery would likely reveal or why those facts would preclude summary judgment. (*See* ECF No. 33-4 at 2:15–3:22.) Accordingly, Celtic's objection is OVERRULED. The parties raise a bevy of other evidentiary objections, but the Court does not rely on the objected-to evidence and so does not reach the additional objections.

1   specifies the rules governing BNSF's carriage of intermodal shipments.  (ECF No. 23-3 at ¶ 7.)

2   J.B. Hunt submitted to BNSF, via electronic data interchange ("EDI"), bill of lading shipping

3   orders for the three shipments pursuant to the terms of JBPREMIUM.  (ECF No. 23-3 at ¶ 4.)

4   Each EDI submission triggered the creation of a computer-generated waybill for its respective

5   shipment.  (ECF No. 23-3 at ¶ 4.)

6         On June 17, 2013, the BNSF train carrying the shipments derailed near Summerfield,

7   Texas.  (ECF No. 33-1 at No. 51.)  The parties dispute the cause of the derailment.  BNSF argues

8   that the derailment was due to an act of God—an extreme gust of wind.  (ECF No. 23-1 at 15:25–

9   18:18.)  Celtic argues that the train derailed not due to an act of God, but because BNSF

10   negligently allowed a "relatively light-weight and high profile train to proceed into a wind

11   storm."  (ECF No. 33 at 19:20–21.)

12         Celtic sued BNSF after a series of assignments of rights, the sequence of which is

13   disputed but irrelevant.  Celtic asserts three claims under a provision of the Interstate Commerce

14   Act known as the Carmack Amendment, 49 U.S.C. § 11706.[2]  (Compl., ECF No. 1 at 3:20–5:7.)

15   BNSF moves for summary judgment.

16   **II.   MOTION TO STRIKE**

17         Before turning to BNSF's motion for summary judgment, the Court addresses Celtic's

18   motion to strike, (ECF No. 39).  Celtic asks the Court to strike BNSF's reply briefing in support

19   of its motion for summary judgment because the briefing exceeds the allotted page limit.  (ECF

20   No. 39 at 3:5–11 (citing *Smith v. Frank*, 923 139, 142 (9th Cir. 1991).)

21         The Court will highlight the problem as follows.  In Celtic's opposition to BNSF's motion

22   for summary judgment, Celtic argued in part that the Court should deny BNSF's motion pursuant

---

[2] Celtic alleges jurisdiction under 28 U.S.C. § 1331, but the Court actually has jurisdiction over claims arising under the Carmack Amendment pursuant to § 1337.  *See Hunter v. United Van Lines*, 746 F.2d 635, 638–39 (9th Cir. 1984).  Section 1337 vests the Court with jurisdiction "only if the matter in controversy for each receipt or bill of lading exceeds $10,000 exclusive of interests and costs."  28 U.S.C. § 1337(a).  Although Celtic cites the wrong section of Title 28, the error amounts "to no more than inartful pleading, an error that does not in itself constitute an actual defect of federal jurisdiction."  *Nationwide Mut. Ins. Co. v. Liberatore*, 408 F.3d 1158, 1162 (9th Cir. 2005) (quotation omitted).  Celtic alleges claims in connection with three shipments that are each worth over $10,000, so the amount-in-controversy requirement of § 1337 is satisfied.  (ECF No. 1 at 3:20–5:7.)  Given the long pendency of the instant motions, the Court does not believe that dismissing the complaint because of Celtic's technical oversight would serve the cause of justice.  "[F]ormal amendment is not required when"—as here—the Court "can readily recognize the existence of jurisdiction."  *Liberatore*, 408 F.3d at 1162 n.2.

1  to Rule 56(d) to allow Celtic additional time for discovery.  (ECF No. 33 at 4:7–25.)  When

2  BNSF filed its reply, BNSF addressed Celtic's substantive legal arguments in a ten-page brief.

3  (ECF No. 35.)  But BNSF also filed a ten-page attachment to the reply, which BNSF styled as an

4  opposition to Celtic's Rule 56(d) "motion," bringing the total number of pages to twenty.  (ECF

5  No. 35-1.)  The Pretrial Scheduling Order limits replies to ten pages.  (Order, ECF No. 19 at 5:8–

6  11.)

7        The Court may impose sanctions for over-length filings "including, in appropriate cases,

8  striking the offending pleading."  *Smith*, 923 F.2d at 142.  Here, the Court does not believe that

9  striking BNSF's reply briefing would be an appropriate sanction because the over-length filing

10 appears to result from good-faith confusion about the operation of Rule 56(d).  BNSF cites recent

11 in-circuit authority requiring a party seeking relief under Rule 56(d) to make a motion rather than

12 raise the issue in an opposition.  (ECF No. 41 at 3:16–23 (citing *In re Cardtronics ATM Fee*

13 *Notice Litig.*, 874 F. Supp. 2d 916, 927 (S.D. Cal. 2012).)  According to BNSF, it believed Celtic

14 was making a Rule 56(d) motion and believed it was entitled to file an opposition.  (ECF No. 41

15 at 2:12–25.)  Given the parties' apparent confusion, the Court concludes that striking the

16 offending pleading would not be an appropriate sanction.  Accordingly, Celtic's Motion to Strike

17 (ECF No. 39) is DENIED.

18    **III.    LEGAL STANDARDS**

19       A.  Summary Judgment

20       Summary judgment is appropriate when the Court is satisfied that there is no genuine

21 dispute as to any material fact and the moving party is entitled to judgment as a matter of law.

22 Fed. R. Civ. P. 56(a).  The "threshold inquiry" is whether "there are any genuine factual issues

23 that properly can be resolved only by a finder of fact because they may reasonably be resolved in

24 favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  When the

25 Court looks at the evidence presented by the parties, it must credit the non-moving party's

26 evidence and draw all justifiable inferences in the non-moving party's favor.  *Id.* at 255.  But

27 inferences are not drawn out of the air.  It is the non-moving party's obligation to produce a

28 factual predicate from which the inference may be drawn.  *Mayweathers v. Terhune*, 328 F. Supp.

4

2d 1086, 1092–93 (E.D. Cal. 2004); *UMG Recordings, Inc. v. Sinnott*, 300 F. Supp. 2d 993, 997 (E.D. Cal. 2004).

When the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could do anything but find in its favor. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the moving party carries its initial burden, the burden then shifts to the non-moving party, who "must establish that there is a genuine issue of material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). The non-moving party cannot merely rely upon the pleadings. *Estate of Tucker ex rel. Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir. 2008). Instead, it must produce evidence setting forth specific facts showing that there is a genuine issue for trial. *Id.*

In resolving the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (quotations omitted).

B. The Carmack Amendment

The Carmack Amendment is an absolute-liability regime designed to compensate shippers for goods that are damaged or lost during interstate shipping. *OneBeacon Ins. Co. v. Haas Indus., Inc.*, 634 F.3d 1092, 1097 (9th Cir. 2011) (citing *Kawasaki Kisen Kaisha Ltd. v. Regal–Beloit Corp.*, 561 U.S. 89, 98 (2010)). The Carmack Amendment provides a statutory right of action to "the person entitled to recover under the receipt or bill of lading" for a damaged shipment. 49 U.S.C. § 11706(a). When cargo is lost or damaged during shipping, the Carmack Amendment imposes absolute liability on the receiving rail carrier and the delivering rail carrier—regardless of where along the rail route the cargo was actually damaged or which carrier was responsible. *See id.*; *Regal-Beloit*, 561 U.S. at 98. To make out a prima facie case under the Carmack Amendment, a plaintiff must show: (1) that the goods were delivered to the carrier in good condition; (2) that the goods arrived in damaged condition (or not at all); and (3) an amount of damages. *Missouri Pac. R.R. v. Elmore & Stahl*, 377 U.S. 134, 138 (1964); *Nippon Yusen Kaisha*

*v. Burlington & N. Santa Fe Ry. Co.*, 367 F. Supp. 2d 1292, 1298 (C.D. Cal. 2005).

However, the carrier may assert an affirmative defense. Section 10502(e) of Title 49 authorizes carriers to contract with their shippers for "alternative terms" that would otherwise be inconsistent with the Carmack Amendment. *See* 49 U.S.C. § 10502(e) ("Nothing in . . . section 11706 . . . shall prevent rail carriers from offering alternative terms."); *Nippon Yusen Kaisha*, 367 F. Supp. 2d at 1298–99. Section 10502(e) thus "frees rail carriers from the strict application of the Carmack Amendment." *Comsource Indep. Foodservice Cos. v. Union Pac. R.R.*, 102 F.3d 438, 443 (9th Cir. 1996). For the alternative terms to be effective, the shipper must be given "reasonable notice" of the terms and "the opportunity to obtain information necessary to making a deliberate and well-informed choice." *Clarke Logistics v. Burlington N. and Santa Fe Ry. Co.*, 347 F. Supp. 2d 891, 894 (S.D. Cal. 2004) (citing *Comsource*, 102 F.3d at 444).

**IV.    DISCUSSION**

In its motion, BNSF invokes an alternative term and contends that the Court should enter summary judgment in its favor because Celtic cannot sue BNSF pursuant to contractual limitations. (ECF No. 23-1 at 9:17–13:26.) BNSF also argues that it is entitled to summary judgment because: (1) Celtic is not a party that is entitled to recover under the Carmack Amendment; (2) the derailment was caused by an act of God; and (3) one of Celtic's claims is time-barred. (ECF No. 23-1 at 14:1–20:22.) The Court concludes that Celtic cannot sue BNSF, so the Court does not reach BNSF's remaining arguments.

A. <u>Celtic Cannot Sue BNSF</u>

Each of the three waybills issued for the wine shipments incorporates by reference the IR & PG. (ECF No. 23-3 at ¶ 5.) The IR & PG contains a provision which the Court refers to as the Direct Suit Prohibition. The Direct Suit Prohibition provides:

> Only the Shipper (the party indicated on the BNSF price authority and paying BNSF for the rail transportation) may initiate and maintain a claim for cargo loss and damage or a suit against BNSF. A person who is not party to the price authority with BNSF will have no claim or cause of action against BNSF for loss or damage to cargo, nor will such party's claim to BNSF or to any other entity be recognized as the Shipper's claim to BNSF without an assignment of rights to that entity by the Shipper.

(ECF No. 23-3 at ¶ 14.) It is undisputed that J.B. Hunt alone is the party indicated on the BNSF price authority and paying BNSF for the rail transportation. (ECF No. 33-1 at No. 26.)[3] Celtic does not contend that it or its assignors are indicated on the price authority, or that it or its assignors have received an assignment of J.B. Hunt's rights. Thus, BNSF argues that Celtic has no claim or cause of action against BNSF for damages arising from the derailment. (ECF No. 23-1 at 9:17–13:26.) In the parlance of the shipping industry, Celtic is located upstream from the J.B. Hunt–BNSF waybills. The crux of this case is whether Celtic is bound by a liability limitation—the Direct Suit Prohibition—located in a downstream agreement.

In a threshold attempt to avoid application of the Direct Suit Prohibition, Celtic argues that it is not bound to the terms of the provision for two reasons. First, Celtic contends that the Direct Suit Prohibition is unenforceable on its face because it conflicts with the terms of the Carmack Amendment. (ECF No. 33 at 8:15–9:6.) Second, Celtic argues that it is not bound by the IR & PG because J.B. Hunt was not Celtic's agent. (ECF No. 33 at 7:8–18.) According to Celtic, J.B. Hunt was actually BNSF's agent. (ECF No. 33 at 7:19–8:4.) The Court addresses those issues before turning to the ultimate question: whether Celtic is bound by a downstream limitation of liability.

          *i.*     *Conflict with the Carmack Amendment*

Celtic insists that the Direct Suit Prohibition is unenforceable because it conflicts with the terms of § 11706. (ECF No. 33 at 8:15–9:6.) But § 10502(e) plainly states that "[n]othing in . . . section 11706 . . . shall prevent rail carriers from offering alternative terms." 49 U.S.C. § 10502(e). Celtic cites no authority, and the Court can find none, suggesting that the requirements of § 11706 continue to dictate alternative terms authorized by § 10502(e). To the contrary, courts routinely enforce alternative terms that do not conform with § 11706. For example, in *Clarke Logistics*, the court enforced a contractual provision requiring suits to be filed within one year as an alternative term, even though the provision directly conflicted with

---

[3] Throughout its response to BNSF's statement of undisputed facts, Celtic asserts that facts are disputed without citing any evidence putting those facts in dispute. Along the same lines, Celtic frequently offers limited admissions like "[u]ndisputed that the BNSF self generated [sic] document shows [J.B.] Hunt as the shipper"—without citing any evidence or authority supporting such a limited admission. (ECF No. 33-1 at No. 26.) In all such instances, the entire fact is deemed undisputed. *See* Fed. R. Civ. P. 56(c)(1)(A), (e)(2).

§ 11706(e)'s mandate that rail carriers "may not provide by rule, contract, or otherwise . . . a period of less than 2 years for bringing a civil action" under the Carmack Amendment. *Compare Clarke Logistics*, 347 F. Supp. 2d at 894–98 *with* 49 U.S.C. §11706(e). Similarly, in *Nippon Yusen Kaisha*, the court enforced a contractual provision that the defendant rail carrier would be liable only for its own negligence, even though § 11706 imposes absolute liability. *Nippon Yusen Kaisha*, 367 F. Supp. 2d at 1299–1300. Celtic's argument runs contrary to case law and renders the text of § 10502(e) a nullity. The Court concludes that the Direct Suit Prohibition is an alternative term authorized by § 10502(e).

> ii.    *J.B. Hunt's Agency*

Celtic also argues that two issues concerning J.B. Hunt's agency relationship with Celtic and BNSF preclude summary judgment. (ECF No. 33 at 7:8–8:4.) First, Celtic argues that there is no evidence J.B. Hunt was acting as an agent for Celtic when contracting with BNSF. (ECF No. 33 at 7:11–13.) Celtic is correct, but as discussed *infra* the point is irrelevant. Second, Celtic asserts that there is a genuine dispute of material fact regarding whether J.B. Hunt was an ostensible agent of BNSF in its dealings with Celtic's assignors.[4] (ECF No. 33 at 7:19–8:4.) Citing California law, Celtic contends that "[a]n agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." (ECF No. 33 at 7:20–22 (citing Cal. Civ. Code. § 2300).)

Celtic's theory is not supported by the record. There is no evidence that BNSF intentionally led third parties to believe J.B. Hunt was BNSF's agent. On the contrary, the IR & PG indicates that BNSF took measures to ensure that questions of agency were resolved prior to shipping: the IR & PG specifies that, "when tendering a shipment, the Shipper"—here, J.B. Hunt—"warrants it has authority to enter into this agreement." (ECF No. 33-1 at No. 42.) Similarly, there is no evidence that BNSF led third parties to believe J.B. Hunt was BNSF's agent through want of ordinary care. Celtic emphasizes the fact that J.B. Hunt offers rail service but is not itself a railroad. (ECF No. 33 at 7:22–8:3.) But any confusion sown by that arrangement

---

[4]   Celtic also posits that J.B. Hunt was the actual agent of BNSF, but cites no evidence. The Court need not credit this unsupported contention. *See* Fed. R. Civ. P. 56(c)(1)(A), (e)(2).

arises from what J.B. Hunt, not BNSF, represented to its shippers. Celtic also argues that "BNSF authorized J.B. Hunt to *sell* BNSF's services because it allows J.B. Hunt to directly access its ordering system and trigger the creation of BNSF waybills." (ECF No. 33 at 7:27–28 (emphasis added).) But what BNSF actually authorized J.B. Hunt to do was *purchase* BNSF's services. The IR & PG states that it, "in combination with a specific BNSF price authority"—here, JBPREMIUM—"constitutes an offer by BNSF to provide certain exempt transportation services. A separate agreement is made each time a shipment is tendered to BNSF according to the offer contained in [the IR & PG] and the relevant price authority." (ECF No. 33-1 at No. 42.) Celtic has not provided a factual predicate from which the Court can draw the inference that BNSF inadvertently led third parties to believe J.B. Hunt was its agent through want of ordinary care.

Celtic's ostensible agency theory also fails for a second, independent reason. The evidence shows that neither Celtic nor its assignors believed J.B. Hunt was BNSF's agent such that they were actually contracting with BNSF. According to Celtic's vice president and corporate designee Mark Hyland ("Hyland"), Celtic and its assignors believed at the time of contracting that J.B. Hunt would be responsible for moving the shipments from Napa, California to Little Rock, Arkansas and Memphis, Tennessee, where the wholesalers had requested delivery. (Hyland Dep., ECF No. 23-10 at 25:9–14.) Hyland testified in deposition that Celtic and its assignors expected J.B. Hunt to "secure arrangements with a rail carrier for the rail transport of the three containers." (Hyland Dep., ECF No. 23-10 at 24:4–7.) Hyland also testified that J.B. Hunt normally chose BNSF to be that rail carrier, but that the choice of rail carrier for any given shipment was "entirely up to J.B. Hunt." (Hyland Dep., ECF No. 23-10 at 28:13–18.) That testimony belies any argument that J.B. Hunt was the ostensible agent of BNSF in its dealings with Celtic and Celtic's assignors.[5] In sum, Celtic has not created a genuine issue for trial with its

---

[5] In support of Celtic's opposition to BNSF's motion, Hyland submitted a declaration in which he avers that "[i]t was [his] understanding that J.B. Hunt was acting for BNSF in offering BNSF's services." (Hyland Decl., ECF No. 33-3 at ¶ 12.) That averment runs counter to Hyland's deposition testimony, and runs afoul of the sham affidavit rule. "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). To apply this rule, the Court must (1) make a factual determination that the contradiction is actually a "sham" and (2) believe that the inconsistency between the deposition testimony and subsequent affidavit is "clear and unambiguous." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir. 2009). The Court makes both findings here because Hyland's declaration directly contradicts his deposition. In his deposition, Hyland testified that Celtic and its

perfunctory assertion that J.B. Hunt was BNSF's ostensible agent.

### iii.     Downstream Limitation of Liability

BNSF argues that when J.B. Hunt contracted with BNSF, J.B. Hunt "bound the upstream shippers, cargo owners and intermediaries to the limitations of liability in its contract with BNSF"—including the Direct Suit Prohibition. (ECF No. 23-1 at 10:4–5.) The key question is whether Celtic is bound by a limitation of liability negotiated by J.B. Hunt in a downstream contract with BNSF. Pursuant to the limited agency rule, the answer is yes.

The limited agency rule creates a narrow exception to traditional agency principles in common carriage cases like this one. The limited agency provides that "an intermediary binds the cargo owner to the liability limitations it negotiates with downstream carriers"—even when there are no indicia of a traditional agency relationship. *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 34 (2004).

The rule first appeared over a century ago in *Great Northern Railway Co. v. O'Connor*, 232 U.S. 508 (1914). In *Great Northern*, a woman hired a transfer company to arrange for the shipment of some household goods and personal effects. *Id.* at 509. The transfer company in turn engaged a rail carrier to transport the goods, at a rate that limited the rail carrier's liability to less than the goods' actual value. *Id.* at 509–10. The goods were lost in transit and the woman sued the rail carrier. *Id.* at 510. Even though the woman was not a party to the agreement between the transfer company and the rail carrier, the Supreme Court enforced the liability limitation against her. The Supreme Court held that "the transfer company had been intrusted [sic] with goods to be shipped by railway, and, nothing to the contrary appearing, the carrier had the right to assume that the transfer company could agree upon the terms of the shipment." *Id.* at 514. Thus, the rule acted as a shield for the rail carrier. The owner's remedy was against the transfer company. *Id.* at 514–15.

The Supreme Court reaffirmed the limited agency rule in *Kirby*, which involved a shipment of machinery traveling from Australia to Alabama that was damaged in a derailment.

---

assignors contracted with J.B. Hunt who then selected a rail carrier. In his declaration, Hyland states that Celtic and its assignors contracted with BNSF acting through its agent J.B. Hunt. Those arrangements are mutually exclusive.

1  *Kirby*, 543 U.S. at 18–21.  As in *Great Northern*, the cargo owner in *Kirby* sued a rail carrier that
2  was several entities downstream from the original contract for carriage.  *Id.* at 21.  One of the
3  intervening contracts contained a liability limitation that, if effective against the cargo owner,
4  would have limited the cargo owner's recovery against the rail carrier.  *Id.* at 32.  The Supreme
5  Court enforced the limitation against the cargo owner, holding:

> When an intermediary contracts with a carrier to transport goods, the cargo owner's recovery against the carrier is limited by the liability limitation to which the intermediary and carrier agreed.  The intermediary is certainly not automatically empowered to be the cargo owner's agent in every sense.  That would be unsustainable.  But when it comes to liability limitations for negligence resulting in damage, an intermediary can negotiate reliable and enforceable agreements with the carriers it engages.

*Id.* at 33.  Thus, the *Kirby* court "ensure[d] the reliability of downstream contracts for liability limitations."  *Id.* at 34.  The *Kirby* court observed that, as in *Great Northern*, the cargo owner retains the ability to sue the intermediary if necessary.  *Id.* at 35 (citing *Great N. Ry. Co.*, 232 U.S. at 515).

Here, the limited agency rule means that BNSF may enforce the Direct Suit Prohibition against Celtic.  BNSF has shown that J.B. Hunt agreed to the IR & PG, which includes the Direct Suit Prohibition.  Under the limited agency rule, J.B. Hunt was Celtic's agent for the purpose of negotiating downstream limitations of liability.  "A provision restricting which parties are permitted to bring suit, like the Direct Suit Prohibition, is a limitation on liability."  *C.H. Robinson Intern. v. Burlington N. Santa Fe, LLC*, 2015 A.M.C. 1859, 1869 (C.D. Cal. 2015) (enforcing the same provision from the IR & PG); s*ee also Sompo Japan Ins. Co. v. Norfolk S. Ry. Co.*, 966 F. Supp. 2d 270, 278 (S.D.N.Y. 2013) ("[N]othing in *Kirby* can be read to exclude covenants not to sue as a type of liability limitation.").

Celtic argues that J.B. Hunt was "expressly precluded from acting as Celtic's agent" under the terms of their Broker–Carrier Agreement.  (ECF No. 33 at 7:16–18.)  But the limited agency rule allows the downstream carrier to invoke a liability limitation even if it conflicts with an upstream contract.  *C.H. Robinson*, 2015 A.M.C. at 1870 (citing *Kirby*, 543 U.S. at 33).  Celtic also argues that *Kirby* and *C.H. Robinson* are inapposite because they did not arise under the

11

Carmack Amendment. (ECF No. 33 at 10:14–11:9.) That argument relies upon a distinction without meaning. The limited agency rule plainly applies to Carmack Amendment cases. *See, e.g.*, *Tuggle v. Piggyback Consolidators, Inc.*, No. CV 96–3735 CBM, 1997 WL 900835, at *7 (C.D. Cal. Aug. 22, 1997) (citing *Great N. Ry. Co.*, 232 U.S. at 510–11). The Court concludes that the Direct Suit Prohibition applies to Celtic and bars this lawsuit. Accordingly, BNSF's Motion for Summary Judgment (ECF No. 23) is hereby GRANTED.

The limited agency rule produces an equitable result here as it did in *Great Northern* and *Kirby*: Celtic retains the ability to sue J.B. Hunt. *See Kirby*, 543 U.S. at 35. While BNSF's motion was pending, Celtic decided to do just that. (*See* Compl., *Celtic Int'l, LLC v. J.B. Hunt Transp., Inc.*, No. 2:15-cv-01679-TLN-DB (E.D. Cal. Aug. 7, 2015), ECF No. 1.)

V.   **ADDITIONAL MOTIONS**

   A. Motion to Amend

Shortly before BNSF filed its motion for summary judgment, Celtic requested leave to file an amended complaint naming J.B. Hunt as a defendant. (ECF No. 22.) While Celtic's motion to amend was pending, Celtic evidently became concerned about the statute of limitations. (*See* Pl.'s Opp'n to Def.'s Mot. to Transfer Venue 2:19–24, *Celtic Int'l, LLC v. J.B. Hunt Trans., Inc.*, No. 2:15-cv-01679-TLN-DB (E.D. Cal. Feb. 24, 2016), ECF No. 17.) To that end, Celtic filed a separate civil action against J.B. Hunt, asserting claims that are identical to the claims it seeks to add against J.B. Hunt in its proposed amended complaint. (*See* Compl., *Celtic Int'l, LLC v. J.B. Hunt Transp., Inc.*, No. 2:15-cv-01679-TLN-DB (E.D. Cal. Aug. 7, 2015), ECF No. 1.) Nevertheless, Celtic's motion to amend was not withdrawn, so the Court addresses it now.

Motions to amend are generally governed by the liberal standard of Rule 15(a) of the Federal Rules of Civil Procedure. But once the Court has issued a pretrial scheduling order, Rule 16(b) supplies the governing standard: the pretrial scheduling order "may be modified only for good cause" shown by the party seeking to modify the schedule. Fed. R. Civ. P. 16(b)(4); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–08 (9th Cir. 1992).

Here, the Court issued its Pretrial Scheduling Order on November 25, 2014. (ECF No. 19.) Among other things, the Order provides that "[n]o joinder of parties or amendments to

pleadings is permitted without leave of court, good cause having been shown." (ECF No. 19 at 1:24–27.) Celtic offers several reasons why amendment should be allowed under Rule 15, but never addresses Rule 16. (ECF No. 22 at 3:9–5:20.) Rule 15 is inapplicable until Celtic first satisfies the good cause standard of Rule 16. *Johnson*, 975 F.2d at 608; *Jackson v. Laureate, Inc.*, 186 F.R.D. 605, 606–07 (E.D. Cal. 1999). Celtic has not made a showing under Rule 16, so its motion for leave to amend (ECF No. 22) is DENIED.

### B. Motion to Set Pretrial Conference

For the reasons set forth above, the Court concludes that the Direct Suit Prohibition bars this lawsuit. Accordingly, there will be no trial and Celtic's motion to set a pretrial conference (ECF No. 59) is DENIED as moot.

### VI. CONCLUSION

For the foregoing reasons, the following is hereby ORDERED:

1. BNSF's Motion for Summary Judgment (ECF No. 23) is GRANTED. The Clerk of the Court shall enter judgment in BNSF's favor on all of Celtic's claims for relief.
2. Celtic's Motion to Strike (ECF No. 39) is DENIED.
3. Celtic's Motion to Amend (ECF No. 22) is DENIED.
4. Celtic's Motion to Set a Pretrial Conference (ECF No. 59) is DENIED as moot.

IT IS SO ORDERED.

Dated: February 22, 2017

Troy L. Nunley
United States District Judge